UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

WILLIE LEE THOMAS,

    Plaintiff,

v.      Case No. 04-3186

KEVIN L. WINTERS et al.,

    Defendants.

### Order

The defendants' motion for summary judgment is before the court. The motion is granted for the reasons below.

### Summary Judgment Standard

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56(c). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).

In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). The question is " . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

### Claims Remaining

On July 20, 2005, the court dismissed all the plaintiff's claims save two:

1.     The following cell conditions the plaintiff endured at Western Illinois Correctional Center amounted to cruel and unusual punishment under the Eighth Amendment:

1

>"Mattresses are torn and filthy."
>
>"Toilets don't flush properly, the human bodily waste is running back and forth, from cell to cell, next door to next door."
>
>"Cell walls and doors within the cells are filthy and all kinds of gang graffiti and food on cell walls and doors."
>
>"Air vents and heat vents are filthy within the cells and units."
>
>"Dietary is not giving a wholesome meal to inmates at every meal, nor with salt and pepper."

2. The defendants unconstitutionally prohibited the plaintiff from sending mail to his family or to the IDOC director during the plaintiff's incarceration at Western Illinois Correctional Center.

## Undisputed Facts

These facts are taken, essentially verbatim, from the defendant's proposed undisputed facts (d/e 69, pp. 2-10), to the extent relevant and supported by their cites to the record, and to the extent not disputed by the plaintiff. Unless otherwise stated, cites to the record refer to the defendants' memorandum in support of their summary judgment motion, docket number 69.

### *General Background*

1. The allegations in the Complaint concern the Western Illinois Correctional Center. The Court notes that the exact time frame and duration of the plaintiff's stay at Western are not clear. It appears that the plaintiff was incarcerated in about 15 different cells at Western from fall, 2003 to sometime in 2005, about seven of which were segregation cells. (*See* Complaint (d/e 9); Plaintiff's Motion for Summary Judgment, d/e 56; Plaintiff's Aff., d/e 75, ¶13).

2. Kevin Winters was the Chief Administrative Officer at Western Illinois Correctional Center.

3. Roger Zimmerman was and is an Assistant Warden at Western.

4. Sandra Funk was also an Assistant Warden at Western.

5. Major Scott McKee was and is over Internal Affairs at Western.

6. The Plaintiff is no longer incarcerated at the Western Illinois Correctional Center.

### *Food*

6. At his deposition, the Plaintiff testified that, upon his arrival at Western Illinois Correctional Center, he was feed less food than he had previously received at Lawrence Correctional Center. (Plaintiff's Dep. at 44).

7. The Plaintiff is approximately 5 feet 9 inches tall and weighs approximately 210 pounds. (Plaintiff's Dep. at 45-46).

8. The Plaintiff testified that he lost a lot of weight at Western, but did not remember how much. He did not remember even if he lost at least five pounds. (Plaintiff's Dep. at 47).

9. The Plaintiff does not recall having to get a smaller pant size while he was at Western Illinois Correctional Center. (Plaintiff's Dep. at 49).

10. Meals are prepared and made available to offenders at Western Illinois Correctional Center three times daily. (Affidavit of Martha Fluckey at ¶ 2, Exhibit 4).

11. According to Fluckey, the menu provided to offenders at Western Illinois Correctional Center meets or exceeds the minimal nutritional and caloric requirements as established by the National Academy of Sciences. (Fluckey Affidavit, ¶3). She attaches menus for the time period October 31, 2004 to November 13, 2004, which she avers are representative of the meals provided inmates. The plaintiff avers, however, that, "Food was often served wih missing menu items and much smaller portions than the menu specified." (Plaintiff's Aff., d/e 72, ¶ 8).

*Mail*

12. At his deposition, the Plaintiff stated that he had been able to send a grievance to the Warden and to the Director's office, without interference, while at Western Illinois Correctional Center. (Plaintiff's Dep. at 50-51).

13. The Plaintiff claims that a letter to the Director did not go out when it was supposed to, but he admits that the letter did reach the Director eventually. (Plaintiff's Dep. at 52).

14. The Plaintiff received mail from his mother and his "girl" while he was at Western Illinois Correctional Center. (Plaintiff's Dep. at 52).

15. The Plaintiff claims that he wrote his mother and girlfriend weekly, while at Western Illinois Correctional Center, but that they never received his mail. (Plaintiff's Dep. at 52).

16. The Plaintiff was able to speak to his mother and girlfriend on the telephone while he was at Western Illinois Correctional Center. (Plaintiff's Dep. at 59).

17. The institution will not send out non-legal mail, unless an inmate first pays for postage. (Plaintiff's Dep. at 61-62).

18. A "write-out" is an envelope that has pre-paid postage on it.  (Plaintiff's Dep. at 62).

19. At Western Illinois Correctional Center, inmates are able to go to the commissary and purchase write-outs, if they have money.  (Plaintiff's Dep. at 62).

20. While at Western Illinois Correctional Center, the Plaintiff could go to the commissary, he just did not have any money to buy anything.  (Plaintiff's Dep. at 15-16).

21. According to Lisa Hapke, Western's mail room supervisor, and Scott McKee (Internal Affairs), no one was instructed to alter, stop, hold or tamper with any mail from the Plaintiff at any time while he was housed at Western Illinois Correctional Center.  (Affidavit of Lisa Hapke at ¶ 3, Exhibit 5); (McKee Affidavit, ¶ 4); (Zimmerman Affidavit, ¶9).

22.  Western Illinois Correctional Center maintains records of ingoing and outgoing inmate privileged/legal mail in the ordinary course of business.  (Hapke Affidavit, ¶7).

23. While at Western Illinois Correctional Center, the Plaintiff sent and received numerous letters that were privileged/legal mail.  (Hapke Affidavit, ¶8; copies of records of the Plaintiff's ingoing and outgoing inmate privileged/legal mail attached thereto).  A log of incoming and outgoing mail for the plaintiff shows about 51 letters going to and from the plaintiff during his incarceration at Western, mostly to/from attorneys, clerks, judges, the IDOC Director, the Governor, U.S. Department of Justice, and the like.  *Id.*

*Toilets*

24. According to Richard Ward, the chief engineer at Western, the toilets and waste pipes in the housing units at Western Illinois Correctional Center are designed and operate pursuant to plumbing code.  (Affidavit of Richard Ward ¶ 2, Exhibit 6).

25. Ward avers that, as designed and operated, waste from the toilet in one cell does not enter the toilet of another cell, nor is it necessary to flush two toilets simultaneously. (Ward Affidavit, ¶¶ 3-4).  The plaintiff disputes this.  He testified in his deposition that waste from the toilet in the adjoining cell traveled to the toilet in his cell when flushed.  (Plaintiff's Dep. at 19-20).  The plaintiff says had to flush his own toilet to get rid of the waste, which he believed only traveled back to the toilet in the adjoining cell. *Id.* at 21.  The plaintiff believed that both toilets had to be flushed simultaneously to make the waste go down the intended pipe. *Id.*

26. Toilets and waste pipes occasionally do become clogged. (Ward Affidavit, ¶5). When this occurs, a work order is submitted and maintenance or repair work is performed as necessary. (Ward Affidavit, ¶6).

27. Western Illinois Correctional Center maintains records of work orders in the ordinary course of business.  (Ward Affidavit, ¶7).

28. Western Illinois Correctional Center also maintains records of offender housing assignments. (Ward Affidavit, ¶8).

29. According to DOC records, the Plaintiff was housed at Western Illinois Correctional Center, R-4, B-Wing, Cell Number 18, from February 10, 2005 through February 20, 2005. (Ward Affidavit, ¶9).

30. A work order was submitted on February 16, 2005, for a plugged toilet in R-4, B-Wing, Cell Number 18. (Ward Affidavit, ¶10).

31. According to the physical plant services work order log, the toilet was unplugged and the problem was corrected that same day. (Ward Affidavit, ¶11). The plumber ran a "snake" through the toilet and unclogged it. (Plaintiff's Dep. at 35).

32. To the knowledge of the Chief Engineer at Western Illinois Correctional Center, other than one plugged toilet fixed the same day that the work order was received, there were no problems with the toilets in any cells that the Plaintiff was housed in. (Ward Affidavit, ¶13).

33. Waste never came out of the toilet bowl onto the floor of the Plaintiff's cell. (Plaintiff's Dep. at 24). The plaintiff disputes this in his affidavit in opposition to summary judgment, but his deposition testimony trumps his affidavit. *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 533 (7th Cir. 1999)("It is a well-settled rule of this Court that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition."); *see also discussion below*.

34. The Plaintiff is unaware of any other inmate having waste come out of the toilet bowl onto the floor of his cell. (Plaintiff's Dep. at 24).

*Cleanliness*

35. The Plaintiff is not saying that all of the mattresses at Western Illinois Correctional Center are torn or filthy. (Plaintiff's Dep. at 8). The Plaintiff is not saying that all of the mattresses that he was provided were torn or filthy either. (Plaintiff's Dep. at 11).

36. However, the plaintiff testified in his deposition that most of his mattresses were torn and filty, with the exception of two cells (Plaintiff's Dep. at 12). He testified that his problem with the mattresses was mostly in the segregation cells, but sometimes in the general population–"torn . . . with nasty body spots here and there and so on." (Plaintiff's Dep. at 39).

37. Inmates are provided a sheet to cover their mattress and another sheet to cover themselves. (Plaintiff's Dep. at 9).

38. According to the Plaintiff, these sheets are washed once or twice a week. (Plaintiff's Dep. at 9).

5

39. In general population, cleaning supplies, including a disinfectant, are passed out weekly. (Plaintiff's Dep. at 13).

40. Cleaning supplies are issued to inmates in general population at the Western Illinois Correctional Center to be used in cleaning their cells in the housing units. (Affidavit of Roger Zimmerman, ¶3).

41. During his deposition, the Plaintiff indicated that his claims about gang graffiti and food on the cell walls and doors were only experienced in segregation. (Plaintiff's Dep. at 38).

42. At his deposition, the Plaintiff described this claim, stating in pertinent part:

I would say it was gang graffiti, and I would say it was all types of drawings, disrespectful things, on the wall as far as drawings and chipping of paint and so on. Now all of the cells, I would say it was a lot of food on a lot of them where, you know, at the bottom of the door where the guy stack the trays at. Now, we talking about seg now right? (Plaintiff's Dep. at 38).

43. Cleaning schedules for segregation are set forth by procedure, and cleaning supplies are issued to offenders in segregation to be used in cleaning their living areas. (Zimmerman Affidavit, ¶4).

44. The procedures used at Western Illinois Correctional Center require that laundry services and a clean jump suit be provided to offenders in segregation on a weekly basis. (Zimmerman Affidavit, ¶5; Segregation Unit Operations Procedure, #01-002 (D)(1), attached thereto).

45. The procedures used at Western Illinois Correctional Center require that pillow cases and sheets of offenders in segregation be exchanged for laundering services on a weekly basis. (Zimmerman Affidavit, ¶5; Segregation Unit Operations Procedure, #01-002 (D)(1-2), attached thereto).

46. The procedures used at Western Illinois Correctional Center require that offenders in segregation be provided with running water and a toilet that can be flushed. (Zimmerman Affidavit, ¶5; Segregation Unit Operations Procedure, #01-002 (D)(1), attached thereto).

47. The procedures used at Western Illinois Correctional Center require that offenders in segregation be provided heating and ventilation, which are consistent with climatic conditions. (Zimmerman Affidavit, ¶5; Segregation Unit Operations Procedure, #01-002 (D)(1), attached thereto).

48. The procedures used at Western Illinois Correctional Center require that offenders in segregation be provided with necessary cleaning items, as required, and at least

weekly.  (Zimmerman Affidavit, ¶5; Segregation Unit Operations Procedure, #01-002 (D)(2), attached thereto).

49. Air moves through the vents at Western Illinois Correctional Center.  (Plaintiff's Dep. at 40).

50. At his deposition, the Plaintiff acknowledged that there was no continuous cloud of dust coming from the vents.  (Plaintiff's Dep. at 42).

51. The Plaintiff testified that he had experienced dust when the air was turned off and on.  (Plaintiff's Dep. at 41).

52. Safety and sanitation inspections are performed monthly.  (Zimmerman Affidavit, ¶6).

53. Western Illinois Correctional Center maintains records of these safety and sanitation inspections in the ordinary course of business.  (Zimmerman Affidavit, ¶7).

54. Monthly safety and sanitation inspections kept by the DOC in the ordinary course of business do not substantiate the Plaintiff's claims about the conditions at the Western Illinois Correctional Center.  (Zimmerman Affidavit, ¶8).

**Analysis**

**I.  Mail Interference**

Inmates have a constitutional right to send and receive mail, subject to legitimate penological purposes.  *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  However, sporadic, short-term delays in mail delivery do not violate the Constitution.  *Zimmerman v. Tribble*, 226 F.3d 568, 572-73 (7th Cir.2000)(allegation that prison had routine practice of not processing mail timely not enough to state a claim)*; Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir.1999).

The plaintiff asserts that a factual dispute exists regarding "whether mail was deliberately interfered with by staff."  (d/e 76, ¶ 6).  He states in his affidavit that, "Often when I sent mail out, it never reached the party I addressed it to.  Sometimes the mail was grievances and other complaints.  Sometimes, when I received my mail, I just received the envelop [sic] with nothing in it.  Often, the mail, when it did get through, arrived 10 or so working days after it was postmarked."   (d/e 75 ¶¶ 10-11).[1]  These allegations are too general and vague to allow an inference that the plaintiff's mail was interfered with, much less on a constitutional level.

---

[1]On the other hand, he testified in his deposition that his mail interference claim was based primarily on one letter to the Director.

7

Letters delivered within 10 days of their postmark is not the kind of serious delay that troubles the Constitution. His primary complaint seems to be one letter he sent to the Director of the IDOC, again not the kind of systemic problem that might be actionable under the Constitution. (Plaintiff's Dep. at 58). He gives no further information on what letters or grievances did not get mailed or whether those letters had proper postage (for non-legal). He says nothing of the defendants' mail log, which shows that he did send and receive mail regularly. Further, the plaintiff does not have any personal knowledge that an addressee did not receive one of his letters–that the plaintiff received no response does not show a letter was not mailed.

In short, the plaintiff has failed to show a genuine issue of disputed material fact exists on his mail interference claim. Summary judgment must therefore be granted to the defendants.

## II. Cell Conditions[2]

An Eighth Amendment claim alleging cruel and an unusual punishment has two requirements: 1) the deprivation suffered was objectively, "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001); and, 2) the defendants were deliberately indifferent to that serious deprivation (the subjective requirement). *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001).

Regarding the objective test, "the Constitution does not require that prisons be comfortable, [but] prison conditions do violate the Constitution where they 'deprive inmates of the minimal civilized measure of life's necessities.'" *Delaney*, 256 F.3d at 683, *citing Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). The "totality of the conditions" is the focus, *Demallory v. Cullen*, 855 F.2d 442, 445 (7th Cir.1988), judged against "contemporary standards" evolving with society–i.e., whether the conditions "exceeded contemporary bounds of decency of a mature civilized society." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

As to the subjective requirement, prison officials must "'act with a sufficiently culpable state of mind'"–deliberate indifference. *Johnson v. Snyder,* 444 F.3d 579, 585 (7th Cir. 2006). "[T]he minimum intent required is 'actual knowledge of impending harm easily preventable.'" *Harris v. Fleming*, 839 F.2d 1232 (7th Cir. 1988), *quoting Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985). No liability attaches if the harm is remote, or officials aren't aware of or are unable to correct the problem. *Id. Subjective* awareness is required. *Johnson,* 444 F.3d at 585. Deliberate indifference is not negligence or even gross negligence–it "'approaches intentional

---

[2]The plaintiff made similar claims in a class action about conditions at Menard Correctional Center, *Robinson v. Page*, 96-43-CJP (S.D.Ill., Magistrate Judge Clifford Proud)(http://pacer.uspci.uscourts.gov), in which summary judgment was granted for defendants. *Id.*, Document #145 (entered August 4, 2000)(pp. 24-27 discuss Thomas' claims, which included a repetitious, inadequate diet, denial of the full allotment of food, denial of adequate cleaning supplies, and malfunctioning plumbing, among others). Those claims involved a different prison, however, so their disposition does not preclude the claims here.

wrongdoing,'"'essentially a criminal recklessness standard, that is, ignoring a known risk.'" *Id.*, (citations omitted).

The plaintiff contends that the following factual disputes exist:

1) whether mattresses in segregation were torn and filthy with human body fluids and other debris;

2) whether toilets didn't work properly when flushed such that feces and urine remained in toilets or were discharged into toilets of other inmates in other cells;

3) whether conditions of segregation cells were filthy, inmates were not supplied cleaning supplies, showers covered with mildew, air vents in cell not cleaned over years and filled with filth, unbearable conditions of extreme heat in summer and cold in winter;

4) whether food portions were adequate or even as specified in the posted menu;

5) whether 5-7 minutes to eat meals was adequate time and resulted in a nutricious [sic] meal being consumed, even if one was served. (d/e 76, ¶¶ 1-4).

Initially, the court notes that the plaintiff's response to summary judgment adds some new claims not part of this case, namely, "unbearable heat and cold,"; "showers were filthy and visible mildew could been seen and the smell so pungent the staff stood back."; raw chicken; and only 5 minutes to eat (d/e 75, ¶¶ 8, 12). The plaintiff made no such allegations in his Complaint, nor did he move to amend his Complaint after his claims were identified in the Court's Order of July 20, 2005. (7/20/05 Court Order, d/e 50; Plaintiff's Dep. at 6-8). Nor did the plaintiff mention these allegations at his deposition, when he was pinned down on his claims by defendants' counsel. (Plaintiff's Dep. at 6-8). Allowing new claims at this late date, made in response to summary judgment after the close of discovery, would cause undue prejudice to the defendants. There is no reason why these claims could not have been brought when the Complaint was filed. Bringing them now evidences undue delay at best. To allow them would require a re-opening of discovery. Accordingly, the plaintiff's attempt to add new claims is denied, to the extent he seeks to do so. The merit of his new allegations will not be addressed.

Additionally, the plaintiff's affidavit in response to the summary judgment motion contradicts his deposition testimony in part. To the extent they contradict, his deposition testimony prevails:

A plaintiff cannot . . . create an issue of material fact by submitting an affidavit that contradicts an earlier deposition . . . When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration the 'affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or

because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.

*Pourghoraishi v. Flying J., Inc.*, 449 F.3d 751, 759 (7th Cir. 2006), *citing Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 533 (7th Cir. 1999)("It is a well-settled rule of this Court that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition.").

Turning to the merits of the plaintiff's claims, the Court agrees with the defendants that the Plaintiff's deposition testimony shows that the conditions he experienced at Western were not objectively serious enough to violate the Eighth Amendment.

As to the filthy mattresses, the plaintiff did testify that most of his mattresses were torn, cut open or ripped, with "bodily human waste all over them, all kinds, you name it, and food, food also on it." (Plaintiff's Dep. at 8). He testified that the main mattress problem was in segregation,

> but you got a few mattresses in population that have body waste on them and urine and so on on them. They just nasty. And they should replace them with new ones. Some are tore up because guys would be hiding contraband in the mattress because they easy to tear or rip or whatever they might have in there, you know." (Plaintiff's Dep. at 39).

In his deposition, he described the mattress he used most in general population as one like "when I was in [] 4-B-18. That mattress was not only torn, but had a bunch of spots on it, nasty body spots here and there and so on." *Id.* at 39.[3] In his affidavit in opposition to summary judgment, the plaintiff avers that one of his mattresses (apparently in cell number 4-B-71) was "saturated with urine and was torn and coming apart. My complaints on this matter were ignored by staff and my formal grievances were denied." (d/e 75, ¶13). The defendants do not appear to directly dispute the plaintiff's characterization of the mattresses, though the attach inspection reports that make no mention of dirty mattresses. On summary judgment, the court credits the plaintiff's description of his mattresses.

In the court's opinion, having to sleep on a mattress soiled with the bodily excretions of others could rise to an "objectively serious" condition under Eighth Amendment standards, depending on the duration of the condition and the severity of the soiling. Here, however, the plaintiff testified that he was provided with two sheets: one to cover the mattress and one to cover himself. These sheets were washed at least weekly. (Plaintiff's Dep. at 9). By his own testimony, the plaintiff did not have to lie directly on a soiled mattress, but instead slept on a clean sheet on top of the mattress. Under these circumstances, the Court does not believe the

---

[3]Earlier in his deposition he stated that 4-B-18 did not have a torn mattress, (Plaintiff's Dep. at pp. 11-12), but that quibble is unimportant.

10

soiled mattresses, as described by the plaintiff, amounted to the kind of serious deprivation prohibited by the Eighth Amendment, either viewed alone or viewed in the totality of conditions.

Likewise, as to the cleanliness of the cell, the court does not believe the plaintiff's deposition allows a reasonable inference of a serious deprivation under Eighth Amendment standards. While far from optimal (crediting the plaintiff's description in his deposition), the plaintiff did receive cleaning supplies–liquid soap, disinfectant–and was able to mop, though with his own rags and with water (or some sort of mopping solution) that had already been used by other inmates. (Plaintiff's Dep. at 13-14).[4] He also testified that often the problem was other cellmates' dirty habits:

> See, they don't let you clean up regular like they should do. Some guys got all types of germs and chemical and bacteria. You know, you ain't got no clean cellmates around here. . . .It is just like the incident I am in now. I got a young guy. He nasty. But I got to live in there with him. . . . If I clean up, he mess it up. So I just stop cleaning up until he leave or I leave." (Plaintiff's Dep. at 17).

The court does not believe the lack of cleanliness described by the plaintiff, either viewed alone or viewed in totality with the other conditions, allows a reasonable inference that the plaintiff suffered objectively serious deprivations. *Cf. Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992)(triable issue where affidavit set forth "barbarous conditions . . . in rather excruciating detail" and averred he lived with "filth, leaking and inadequate plumbing, roaches, rodents, the constant smell of human waste, poor lighting, inadequate heating, unfit water to drink, dirty and unclean bedding, without toilet paper, rusted out toilets, broken windows, . . . drinking water containing small black worms which would eventually turn into small black flies.").

As to the vents, the plaintiff testified that the vents were "all clogged up and filthy with all types of dust just been setting in them for a while. And, you know, you got all types of fiber, bacteria and germs floating there just setting there. And when they do turn on the heat or even the air, it blows out like a big cloud of dust. And you have to breathe it in." (Plaintiff's Dep. at 40). This dust would blow out when the air was turned on and off, but not continuously. *Id.* at 41. Nevertheless, the plaintiff testified that he would wake up with grayish dirt in his mouth, from breathing the air when sleeping. *Id.* at 42. The plaintiff did clean the outside of the grill with an old toothbrush, but could not reach the dust build-up inside the vent. *Id.* at 43-44.

The plaintiff is not competent to testify that the vents contained bacteria or germs. He can testify to the cloud of dust he saw when the air was turned on and off, but, in the court's opinion, dusty vents do not amount to an objectively serious condition under the Eighth Amendment.

---

[4] As discussed above, the plaintiff's contradictory allegation in his affidavit that no cleaning supplies were issued does not create a material dispute. (d/e 75, ¶ 4).

11

As to the toilets, the plaintiff testified in his deposition:

My biggest problem with that is that my neighbors took a dump one night and they flushed. I am in the bed. . . . All of a sudden I smell something. I wake up out of my sleep. I look over in the toilet. It is body waste in the toilet. (Plaintiff's Dep. at 19).

However, the plaintiff was able to, and did, flush the waste away when this occurred (though he believed it just traveled back to the neighboring cell, not down the pipe). *Id.* at 21. He also testified that the waste did not come out of his toilet bowl onto the cell floor, nor did he know any other inmate whose toilet bowl overflowed with waste from other cells. *Id.* at 24.[5]

Again, while far from optimal, the court does not believe the toilet situation implicates the Eighth Amendment, either alone or in the totality of the conditions described. The plaintiff needed only to flush.

As to the food provided, the plaintiff alleged in his Complaint that it was not "wholesome at every meal." His main complaint in his deposition was that the portions did not weigh enough according to IDOC policy–less than what he received at his prior place of incarceration. He also testified that he received the same food "over and over;" and the meals were not balanced, presumably nutritionally. (Plaintiff's Dep. at 44). He states in his affidavit that "food was often served with missing menu items and much smaller portions than the menu specified. Population inmates prepare the food and determine how much or what went into . . . [the food tray.]. . . Sometimes items like chicken came uncooked or half raw," with only five minutes to eat. (d/e 75, ¶ 8). As discussed above, the raw chicken allegation is new, and, as with the other new claims, is not considered. So is the five-minutes-to-eat claim, but the court does not believe that would meet the objectively serious test in any event.

The plaintiff points to no evidence that the food he received was nutritionally inadequate, either in portion size or nutritional value. That it was less food than he received in a different prison, or repetitious, does not allow an inference that his meals at Western were nutritionally inadequate. He says menu items were missing or smaller in portion than listed, but he does not dispute that he received three meals a day and gives no detail on what food he *did* receive at those meals, either in kind or in amount. He does not maintain that he lost any weight or suffered any health consequences, which, though not necessarily required evidence, would give

---

[5]His affidavit filed in response to summary judgment conflicts with his deposition testimony on this score. He states in his affidavit: "The toilet in the adjacent cell would often flood in to mine when they flushed causing feces and urine to spill onto my floor with nowhere to dispose of it or its stinch [sic]." (D/e 75, ¶ 7). As stated earlier, the plaintiff's affidavit does not contradict his sworn testimony at his deposition. *Pourghoraishi*.

some support to his conclusory assertions. The court does not believe a reasonable juror could conclude that the meals the plaintiff received at Western were nutritionally deficient, based on the present record.

In short, no reasonable juror could find for the plaintiff on the current record. The plaintiff's deposition testimony does not allow a reasonable inference that the conditions he experienced at Western amounted to objectively serious deprivations under the Eighth Amendment, viewed either singly or in their totality. Summary judgment will therefore be granted to the defendants.

IT IS THEREFORE ORDERED:

1) The defendants' motion for summary judgment (docket # 68) is granted. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. All pending motions are denied as moot. This case is terminated, parties to bear their own costs.

2) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal, *See* Fed. R. App. P. 24(a)(1)(c), and must also address whether the plaintiff has "on 3 or more occasions, while incarcerated . . . brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted . . ." 28 U.S.C. 1915(g).[6] If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee whether or not he wins the appeal, and may risk incurring another "strike" if his appeal is dismissed for one of the reasons stated in 28 U.S.C. § 1915(g).

Entered this 31st Day of August, 2006.

s\Harold A. Baker

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

---

[6] A cursory review of PACER indicates that the plaintiff has two "strikes" under this provision, at least as to district court dismissals. *Thomas v. O'Gara*, 02-CV-00711 (S.D. Ill.)(dismissed as frivolous on August 20, 2002); *Thomas v. Pierson*, 98-CV-00153 (S.D. Ill.)(dismissed as frivolous on December 2, 1998).